No. 26-3813

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Sep 23, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| RED WINE & BLUE et al., Plaintiffs-Appellees, | ) | |
| v. | ) | ORDER |
| FRANK LAROSE et al., Defendants-Appellants. | ) | |

Before: NALBANDIAN, RITZ, and HERMANDORFER, Circuit Judges.

With voters' deadline to register for the general election approaching, the district court altered some of Ohio's voter-registration procedures by preliminary injunction. Ohio has appealed the district court's entry of preliminary relief. And it seeks a stay of the preliminary injunction pending appeal. For the reasons given below, we grant Ohio's stay motion.

I

States possess the constitutional authority to set qualifications for voting in federal elections. *See* U.S. Const. Art. I, § 2, cl. 1 & amend. XVII. And all states require that federal voters be U.S. citizens. As a default, states also have the power to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives." *Id.* art. I, § 4, cl. 1. But if Congress chooses, it can "at any time by Law make or alter such Regulations." *Id.*

Since 1993, the National Voter Registration Act (NVRA), Pub. L. No. 103-31, 107 Stat. 77 (1993), has set voter-registration requirements that states must follow. Among other obligations, states must offer in-person registration assistance at designated state agencies as well as accept by-mail applications using specified forms. *See* 52 U.S.C. § 20503(a). Ohio offers those options and then some. Would-be voters may apply for registration by mail, by phone, online, or

in person at government offices, public schools, farmers markets, libraries, and more. Applicants using those avenues must provide their name and other identifying information, including a driver's license number or the last four digits of a social security number. They also must attest under penalty of perjury that they are U.S. citizens.

Ohio also offers voter registration at every Bureau of Motor Vehicles (BMV) office. One way BMV customers can register is by filling out "paper voter registration applications and update forms" that Ohio law requires every BMV to "make available." Ohio Rev. Code § 3503.11(C)(1). Such paper forms are set out for anyone to complete and require only an attestation of eligibility. Unlike the offices Ohio designates as "[v]oter registration agencies" under section 7 of the NVRA, *see* 52 U.S.C. § 20506, BMV clerks "are not required to offer assistance to customers in completing" voter-registration forms, Ohio Rev. Code § 3503.11(C)(1). But they must accept completed paper forms and timely transmit them to election officials on applicants' behalf. *Id.* § 3503.11(C)(1)-(2).

Relevant here is Ohio's implementation of section 5 of the NVRA, often called the "motor-voter" provision. That part of the NVRA directs that "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office." 52 U.S.C. § 20504(a)(1). Ohio law sets out a process for bundling driver's-license applications with voter-registration applications and submitting both by "electronic means." Ohio Rev. Code § 3503.11(A)(1).

That process occurs during customers' BMV transactions for a new or renewed driver's license or other state identification card. During the process, the BMV computer program guides workers and would-be registrants through the required application steps. The driver's-license application phase comes first. If that application is "complete" and approved for submission by the BMV worker, an interim credential is issued. Declaration of Sydney King ¶¶ 15-16, R.35-1, PageID 1135. The computer then advances to the voter-registration prompts. Applicants opting to register may then do so by answering a question on the computer screen.

As BMV-goers well know, obtaining a new driver's license requires the right combination of paperwork. In Ohio, applicants must appear in person and provide documents proving their name, birthday, social security number, Ohio address, and—since 2009—lawful presence in the United States. Ohio Admin. Code § 4501:1-1-21(A), (C), (Q)(1). If an applicant cannot produce the required paperwork during a driver's-license transaction, the BMV's computer system cancels any "[i]ncomplete application" in progress, deletes whatever information the customer or clerk already entered, and ends the transaction. King Decl. ¶¶ 15, 18, R.35-1, PageID 1135. Securing a license renewal is much easier; applicants may generally do so online using only their present, valid Ohio license or license number.

Though the NVRA's motor-voter provision contemplates dual-purpose driver's-license and voter-registration applications, not all driver's license holders may vote. Some drivers, for instance, are too young. Others may have lawful residency, but plainly lack U.S. citizenship based on the residency documents they provide. That latter noncitizen scenario didn't fit neatly with Ohio's BMV-registration law. That's because the law, as it previously stood, could be read to require BMV workers to "offer . . . the opportunity" for voter registration even when a person's driver's-license application demonstrated that he was a noncitizen ineligible to vote. *See* Ohio Rev. Code § 3503.11(A)(1) (Apr. 9, 2025).

In mid-2025, Ohio lawmakers cleared up BMV workers' registration-related obligations by passing House Bill 54. *See* Ohio Rev. Code § 3503.11(A)(1) (June 30, 2025). As amended by H.B. 54, Ohio law now requires a BMV worker to "offer the applicant the opportunity to register to vote or to update the applicant's voter registration by electronic means" only when the applicant (i) "presents proof of United States citizenship" during the driver's-license application process or (ii) has previously presented such proof. *Id.* Qualifying proof includes, among other things, a passport, a current Ohio driver's license if issued after April 2023, or a driver's license number if tied to existing BMV documentation showing citizenship. *See* Ohio Rev. Code § 3501.01(EE)(1).

H.B. 54's passage was not welcomed by all. A few months after the law took effect, two advocacy groups—Red Wine & Blue, "whose mission is to empower women to engage in political

discourse," and the Ohio Alliance for Retired Americans, which seeks to "protect the civil rights of retirees"—sued to challenge H.B. 54 under the NVRA. Compl. ¶¶ 20-22, 32-34, R.1, PageID 6-10. Their theory? H.B. 54 in effect requires documentary proof of citizenship for motor-voter registrations. *Id.* ¶¶ 106-107, PageID 27. Doing so, the Associations asserted, violates the NVRA's "minimum information" provision,[1] which they read to generally bar states from seeking information to verify citizenship as part of the motor-voter registration process.

By way of injury, the Associations asserted that H.B. 54's alleged documentary-proof-of-citizenship requirement "will make it harder for many lawful, eligible Ohio citizens to exercise their fundamental right to vote." Compl. ¶ 1, R.1, PageID 2. They identified two Ohio-based Red Wine & Blue members named Margaret Dutcher and Gianina Borgerson who intended to update their voter registration at the BMV sometime in the future. Both are citizens and have documents proving it. Yet each said she "does not want to" produce any citizenship documentation and "strongly believes" she should not have to. *Id.* ¶¶ 29-30, PageID 9.

Eight months and motion-to-dismiss briefing came and went. Then, in April 2026, the Associations sought preliminary injunctive relief. They reasserted their NVRA preemption theory based upon the "minimum information" provision and their reading of H.B. 54 as imposing a proof-of-citizenship requirement. And they warned that H.B. 54 would hamper Ohioans' "fundamental right to vote" before the October 5, 2026, registration deadline for the general election. PI Br., R.29-1, PageID 373. Like the complaint, the Associations' preliminary injunction submission failed to cite anyone barred from voter registration by H.B. 54 over the prior year.

Ohio opposed preliminary relief. On jurisdiction, it asserted that the Associations lacked standing, including because they had identified no member harmed by the challenged provisions.

---

[1] That provision, located at 52 U.S.C. § 20504(c) under a subheading entitled "[f]orms and procedures," reads:

(2) The voter registration application portion of an application for a State motor vehicle driver's license—

> (A) may not require any information that duplicates information required in the driver's license portion of the form (other than a second signature or other information necessary under subparagraph (C));
>
> (B) may require only the minimum amount of information necessary to—
>
> > (i) prevent duplicate voter registrations; and
> >
> > (ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process . . . .

On the merits, Ohio contested that H.B. 54 imposed any documentation requirement on voter registration and that the NVRA preempted Ohio's bundled-application process. Ohio also urged that any injunction requiring BMV workers to "proactively offer voter registration" to "confirmed noncitizens" would impose significant mid-election-season administrative and training burdens as well as hamper Ohio's effort to police and prosecute noncitizen voting. Ohio PI Opp'n, R.35, PageID 1129.

The Associations made two relevant moves in reply. To answer Ohio's jurisdictional objections, the Associations offered new standing declarations from previously identified Red Wine & Blue members Dutcher and Borgerson (now Fazio, following a name change). Both said they were turned away when applying for driver's licenses because they lacked the necessary proof-of-identity documents. Dutcher's "social security card," she admits, "did not reflect [her] current name." Declaration of Margaret Dutcher ¶ 11, R.49-1, PageID 1537-38. Fazio had the same problem, plus couldn't "locate [her] birth certificate." Declaration of Gianina Fazio ¶ 7, R.49-2, PageID 1541. Because they were "not allowed to obtain a driver's license" at their initial BMV visits, they were "not able to register to vote as part of that process." *Id.*; *see* Dutcher Decl. ¶ 15, R.49-1, PageID 1537-38. Yet both later "registered to vote" in Ohio. PI Reply, R.49, PageID 1528 n.6 (citing Dutcher Decl. ¶ 18, R.49-1, PageID 1538; Fazio Decl. ¶ 10, R.49-2, PageID 1541).

As for the merits, the Associations' reply shifted focus away from the "minimum information" argument. It instead principally asserted that Ohio's electronic motor-voter registration process violated the NVRA provision stating that a driver's-license application should "serve as" a voter-registration application. *See* 52 U.S.C. § 20504(a)(1). As the Associations read that provision, it requires Ohio to offer even those who do not submit a completed driver's-license application the opportunity to "process their driver's license application as a voter registration application." PI Reply, R.49, PageID 1526.

The district court heard argument on the preliminary injunction motion. A few months later, on August 25, 2026, it entered an order preliminarily enjoining Ohio and its officials from

enforcing H.B. 54 statewide. The district court's opinion rested the Associations' standing to seek injunctive relief exclusively on the individual standing of Dutcher and Fazio, even though both had already registered to vote. And it adopted the Associations' merits arguments across the board, concluding that Ohio's motor-voter regime, as amended by H.B. 54, conflicts with the NVRA's "serve as" and "minimum information" requirements.

The terms of the district court's preliminary injunction flow from that statutory holding. It prohibits Ohio "from relying on House Bill 54's amendment to Ohio Revised Code § 3503.11(A)(1) to require any driver's license applicant . . . to produce documentary proof of citizenship before offering the opportunity to register to vote." PI Op., R.57, PageID 1842. The injunction specifies that Ohio's duty to offer voter registration extends to "driver's license applicants who are ultimately unsuccessful in obtaining a driver's license for lack of sufficient documents under Ohio's licensing requirements." *Id.* But it "does not include driver's license applicants" whose application materials "show[] they are noncitizens." *Id.*

Ohio appealed and moved the district court to stay its injunction pending appeal. Alongside jurisdictional objections, Ohio stressed the logistical burdens of compliance and argued that the injunction impermissibly "alter[ed] state election procedures on the eve of an election." D. Ct. Stay Motion, R.59, PageID 1851 (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). The district court declined a stay. It reasoned that standing was present because the problems Dutcher and Fazio described would likely afflict "some future Ohio resident who is a member of one of the Plaintiff organizations." Order Denying Stay, R.63, PageID 1905. And it rejected Ohio's *Purcell* concerns based on its reading of Sixth Circuit precedent as permitting relief up to one month before each election deadline. Last, the district court answered Ohio's compliance concerns by clarifying that BMV officials could "comply with the Injunction" by "proactively offering the paper voter registration applications already at the BMV to eligible citizens." *Id.* at PageID 1900. The Associations had previously argued that the "*separate* paper voter registration application forms" route was "incongruen[t]" with the NVRA's requirement to "treat a *driver's license* application as

an application for voter registration." PI Reply, R.49, PageID 1523. But they endorsed the district court's paper-form option in opposing the stay.

Ohio now asks this Court to enter stay relief on an expedited basis.

II

Four factors guide our inquiry into whether to stay an injunction pending appeal: (1) the likelihood that the appealing party will defeat the injunction; (2) the irreparable harm the appealing party will suffer absent a stay; (3) the prospect of harm to others; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). In assessing those factors, courts must maintain a focus on "*the plaintiffs before the court*," not "*everyone* potentially affected" by the legal challenge. *Trump v. CASA, Inc.*, 606 U.S. 831, 852-53 (2025).

We conclude that all four factors support Ohio's request for a stay.

A

At this juncture, Ohio appears primed to succeed in vacating the injunction on threshold grounds. Because those grounds are sufficient to warrant entry of a stay, we need not address the merits of the district court's NVRA analysis.

*Jurisdiction.* The district court likely lacked jurisdiction to enter forward-looking, prospective relief. Jurisdictional defects appear on the front end with the Associations' apparent lack of standing to press the preemption theory they pled. Back-end jurisdictional problems arise too under traditional mootness principles. Either way, entry of preliminary relief was problematic.

Start with the Associations' Article III standing, which they continue to rest exclusively on an associational-standing theory. To prevail on that theory, the Associations needed to identify at least one "member[]" with "standing to sue in [her] own right." *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quotation omitted). That meant pointing to a "member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct"—not some other cause—and explaining how their "requested relief will redress this injury." *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543 (6th Cir. 2021); *see California v. Texas*, 593 U.S. 659, 670-71 (2021). Further, "standing is not dispensed

in gross." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). Plaintiffs thus "must demonstrate standing for each claim they seek to press" and "*separately* for each form of relief sought." *Id.* (cleaned up). Relevant here, standing to secure prospective injunctive relief requires a plaintiff "likely to suffer future injury" from a challenged law. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

Measured against those standards, Dutcher and Fazio's standing, and thus the Associations', appears lacking. The Associations' stay response focuses on Article III's injury-in-fact requirement. We can accept for argument's sake that Dutcher and Fazio's alleged harm—never being offered an opportunity at voter registration through Ohio's electronic driver's-license process, despite the many other available means—suffices to show Article III injury. Still, the Associations' legal claims have turned all along on the alleged barriers H.B. 54 imposed on BMV-based voter registration. In particular, the Associations read H.B. 54 to prevent BMV clerks from processing voter registrations unless a would-be voter provides documented proof of citizenship.

The hangup: Neither Dutcher nor Fazio ever encountered anything having to do with the Associations' H.B. 54 voter-registration challenge. Instead, BMV officials rejected their *driver's-license* applications based on independent paperwork defects. That dynamic means Dutcher and Fazio "can't demonstrate causation and redressability," which here are "flip sides of the same coin." *Somberg v. McDonald*, 117 F.4th 375, 378 (6th Cir. 2024) (quoting *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 380 (2024)). Because Dutcher and Fazio's procedural objections arise independent from H.B. 54's purported documentation requirement for voters, enjoining that aspect of H.B. 54 seems to solve nothing for them.[2]

The Associations and the dissent's main counter is that Dutcher and Fazio did submit driver's-license applications for NVRA purposes, so should have advanced to the voter-registration prompts. On that view, Dutcher and Fazio "did everything necessary to apply for voter

[2] This defect is sufficient to defeat standing. So for now we can put aside Ohio's alternative argument that enjoining H.B. 54 would only revive BMV clerks' old duty to offer voter registration to known noncitizens who successfully applied for driver's licenses—a category that would still exclude Dutcher and Fazio.

registration," yet were turned away from registering by Ohio law. Stay Opp'n at 17 (emphasis omitted). Even spotting the Associations that much, it remains that Ohio didn't offer voter registration because it didn't treat the relevant driver's-license applications as submitted. The Associations' theory would thus require that Ohio adopt different driver's-license application-submission rules, not an injunction of H.B. 54. So the causation and traceability problems with the Associations' legal challenge and requested relief persist.

Separate and apart from the Associations' standing to bring suit is the problem of mootness. Again, a party seeking immediate injunctive relief must show a likelihood of injury that's "*certainly* impending in the future." *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 904 (6th Cir. 2024) (per curiam) (quotation omitted). Yet all agree that, before the district court entered preliminary relief, Dutcher and Fazio obtained Ohio driver's licenses and registered to vote. So whatever alleged obstacles Ohio law may present to would-be voters, Dutcher and Fazio didn't face them when the district court's decision issued. And there's no prospect Dutcher and Fazio will face the same harm again, let alone imminently, and thus no "Catch-22" attending their challenge. Dissent at 4. That is because license renewals require only a current driver's license number (which Dutcher and Fazio now have) and citizenship information that's in the BMV's database (which Dutcher's and Fazio's now is).

Nor are we convinced that the capable-of-repetition-yet-evading-review exception to mootness salvages Dutcher's and Fazio's standing to pursue a preliminary injunction. The district court applied the exception because "future Ohioans will suffer the same harm." PI Order, R.57, PageID 1828-29. But the relevant repetition of harm must be as to "the complaining party"—not "another member of the public." Fallon et al., *Hart & Wechsler's The Federal Courts and The Federal System* 203 (7th ed. 2015) (citing *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975); *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)). We are aware of no case permitting Associations to end-run that limit by asserting some prospect of future harm to unnamed members. If anything, our standing caselaw confirms that assertions about "unknown members" of Associations fall short of the requirement to "*identify* a member" who has an injury-in-fact and "show that [the] requested

relief will redress this injury." *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 543 (emphasis added) (citations omitted).

*Lawrence v. Blackwell*, 430 F.3d 368 (6th Cir. 2005), on which the Associations rely, is not to the contrary. *Lawrence* applied the capable-of-repetition-yet-evading-review exception in a challenge to a filing deadline for an upcoming election. *Id.* at 371. It did so after concluding that "under the circumstances it [was] reasonable to expect" that the voter and candidate plaintiffs would face the limit's effect in a future election. *Id.* That premise is absent here, where neither Dutcher nor Fazio will again need to complete the challenged driver's-license process. That *Lawrence* added dicta suggesting that the exception could apply because the controversy was likely to recur "with respect to some future potential candidate or voter" does not solve the Associations' problem. *Id.* at 372. The *Lawrence* court accepted that any challenge to the filing deadline at issue would be mooted by an election's passage. *Id.* at 371. Yet here, the challenged provisions of state law are tied to the driver's-license application process more generally. So they do not "evad[e] review" in the same way as issues mooted by "the occurrence of the relevant election." *Id.*

Regardless, the district court's mootness analysis did not proceed on the required "remedy-by-remedy basis." *Lee*, 105 F.4th at 904. It might be that the Associations' "*underlying lawsuit*" can proceed in some other posture. *Brown v. Yost*, 122 F.4th 597, 602 (6th Cir. 2024) (en banc) (per curiam). But to successfully defend their "relief on [their] preliminary injunction," the Associations need to show that Dutcher and Fazio had standing to seek that "interim relief." *Id.* at 601-02. For the reasons we've given, Dutcher's and Fazio's registrations meant their interim-relief request had "become stale" by the time the district court granted it. *Id.* at 602. The preliminary posture of the Associations' relief provides yet another distinction from *Lawrence*, which involved a claim for a *permanent* injunction on appeal. 430 F.3d at 371.

*Purcell.* The district court's injunction also appears to run afoul of *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). *Purcell* instructs "federal courts not to disrupt state election rules close to an election." *Lee*, 105 F.4th at 890. There's "debate" over where the *Purcell* principle fits in our "traditional four-part test for a stay in the election context." *Id.* at 896. But contra the

Associations' contention, there is no dispute under our caselaw that *Purcell* covers court rulings that change how state officials must "process [] registration forms." *Id.* at 898. And the "equities underlying" the *Purcell* factors can sometimes "justify a stay *by themselves*." *Id.* at 896 (citing *Crookston v. Johnson*, 841 F.3d 396, 399 (6th Cir. 2016)).

Recent *Purcell* precedents cut in favor of a stay. Most on point is *Lee*, 105 F.4th 888, which stayed an injunction that altered Tennessee's voter-registration documentation rules about a month before a "looming [] registration deadline," *id.* at 890. *Lee* cited three considerations when applying *Purcell*. *First*, *Lee* looked to the timing of the challengers' claims and the injunction on review. The *Lee* plaintiffs, for their part, had provided "no reasonable explanation" for delaying—over years and election cycles—their request for expedited relief. *Id.* at 898. The same goes here, where the Associations have not explained why they delayed seeking preliminary relief for eight months after filing suit (and ten months after H.B. 54's effective date[3]). That delayed start of the preliminary injunction proceedings pushed the timing of the district court's intervention to just six weeks prior to Ohio's registration deadline for the general election. That period is similar to the one-month lead time *Lee* found problematic.

*Second*, *Lee* noted that the injunction's late-breaking changes risked creating "confusion" for both election administrators and voters as officials "scramble[d] to rewrite" policies and forms. 105 F.4th at 898-900. That factor applies here too. By directing Ohio to "proactively offer" voter registration to those lacking proper driver's-license documentation, Stay Order, R.63, PageID 1900, the district court's injunction has necessitated interim policies that conflict with longstanding procedures and state law. As a result, would-be voters will be told that they lack the right paperwork to submit a driver's-license application but can opt to have that unsuccessful application "serve as" a voter-registration application. Encouraging Ohioans to visit the BMV

[3] The dissent disagrees that *Purcell*'s timing factor favors Ohio in part because the "state (not a federal court) changed the law governing the registration mechanism at issue." Dissent at 8. But while under *Purcell* "federal courts should not impose changes close to an election, States are free to decide for themselves whether last-minute changes to an election are in their best interests." *Allen v. Milligan*, 608 U.S. 511, 514 (2026) (per curiam) (cleaned up). So we respectfully disagree that Ohio's passage of H.B. 54 in mid-2025 bears on the *Purcell* propriety of the district court's entry of preliminary relief in August 2026.

with incomplete paperwork courts chaos that may well affect other BMV business. Election officials will in turn need to intake partial applications, assess voters' eligibility using unverified information, and decipher the new manual notations Ohio has created to implement the district court's order. Unlike the dissent, we understand these steps to comprise a departure from Ohio's pre-suit "processing of registration forms." Dissent at 8. And suffice it to say, we see several points of likely "confusion" in that pipeline of "conflicting guidance." *Lee*, 105 F.4th at 900.

*Third*, *Lee* highlighted the various sovereignty, administrative, and election-integrity harms the injunction would impose on the state. *Id.* at 901. Each is present in Ohio's case. "[O]ur cases teach that a State suffers a form of irreparable injury whenever a court enjoins one of its election laws." *Id.* at 900 (collecting cases). That follows here, where the district court has enjoined Ohio's existing voter-registration process as likely unlawful under the NVRA.

More tangibly, Ohio will have to spend scarce state resources on compliance. Among other steps, Ohio now must train BMV workers to both process the electronic applications the district court's injunction requires and affirmatively point failed driver's-license applicants to paper-registration forms. Ultimately, injunction compliance will require overhauling Ohio's electronic system with complex programming changes—a fact the Associations and the district court appeared to acknowledge. Such changes, Ohio's BMV declarant estimates, would take one year and cost up to $1 million. King Decl. ¶¶ 18-19, R.59-1, PageID 1283-84. Under *Purcell* as in other contexts, Ohio's "unrecoverable compliance costs" support granting it relief. *Kentucky v. Biden*, 57 F.4th 545, 550, 555-56 (6th Cir. 2023).

The Associations, in a view the dissent shares, counter that Ohio's near-term compliance costs should be minimal. That reflects the Associations' view that the "only change the injunction requires" immediately is that BMV clerks now must offer paper forms "*proactively* during a driver's license transaction." Stay Opp'n at 22; *see* Stay Order, R.63, PageID 1900. Ohio responds that this paper-application route creates its own NVRA double-binds. To name one, the Associations read the NVRA to prohibit Ohio from "requesting duplicate information" on a voter-registration form that is "already on the driver's license application." D. Ct. Stay Opp'n, R.60,

PageID 1877 n.3. That might complicate Ohio's ability to ask applicants to complete existing paper registration forms. In any event, states have "finite and rivalrous resources to prepare for and run an election." *Lee*, 105 F.4th at 900 (quotation omitted). Our precedents thus hold that "*some* new burdens on election officials in the weeks before the registration deadline" suffice to trigger *Purcell*. *Id.* So Ohio's compliance burden factors in the *Purcell* analysis, even if Ohio needs something short of a full system overhaul.

Finally, Ohio's "interest in preserving the integrity of its election process" also weighs in its favor. *Id.* at 901 (quoting *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 685 (2021) (citation omitted)). BMV clerks lacking standard documents might inadvertently encourage noncitizens to register or file false applications on their behalf. Such mistakes risk increasing the prospect that ineligible voters will reach the rolls.

Under *Purcell*, "absent the best of reasons, election officials should not have to" shoulder the burdens the preliminary injunction places on Ohio "weeks before voter registration ends." *Id.* (cleaned up) (quoting *Crookston*, 841 F.3d at 399). On this record, we see no such reasons.

B

The other stay factors counsel in favor of staying the district court's preliminary injunction. As just noted, Ohio has weighty equities on its side. Meanwhile, the Associations' delay in seeking relief "suggests that there is, in fact, no irreparable injury." *Kerwin ex rel NLRB v. Trinity Health Grand Haven Hosp.*, 174 F.4th 942, 958-59 (6th Cir. 2026) (cleaned up). And even with that delay, the Associations have identified no eligible, would-be voter prevented by Ohio law from registering. *See supra* pp. 4-6. "[S]o staying the District Court's injunction will not concretely harm" the Associations. *Trump v. California*, Nos. 26A124, 26A139, 609 U.S. ___, 2026 WL 2473573, at *5 (Aug. 24, 2026) (per curiam). Indeed, "[t]hat is why" the preliminary injunction request was likely "not justiciable in the first place." *Id.*

As for public-interest considerations, "[i]t's in the public interest to prevent violations" of the law. *OPAWL – Building AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 785 (6th Cir. 2024). "But it's equally in the public interest to give 'effect to the will of the people by enforcing the laws

they and their representatives enact'" absent any legal basis for enjoining them. *Id.* (quoting *Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020)). The "public interest" likewise favors judicial respect for "federalism and the separation of powers," including Article III limits. *Delaware State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 205 (3d Cir. 2024).

* * *

On balance, the stay factors support Ohio's request for relief. We therefore **GRANT** Ohio's motion for a stay of the district court's injunction pending appeal. We **DENY** Ohio's motion for entry of an administrative stay as moot.

**RITZ, Circuit Judge, dissenting.** I would deny the state's emergency motion for a stay of the district court's carefully reasoned order. So I respectfully dissent from my colleagues' decision to grant the stay.

I.

The district court preliminarily enjoined Ohio from requiring "any driver's license applicant . . . to produce documentary proof of citizenship before offering the opportunity to register to vote," with the exception of "those driver's license applicants who . . . present information showing they are noncitizens." *Red Wine & Blue v. LaRose*, No. 1:25-cv-1760, 2026 WL 2480676, at *26 (N.D. Ohio Aug. 25, 2026). The state now asks us to stay that ruling.

To decide whether to grant a stay of a preliminary injunction, we ask four questions: "Is the applicant likely to succeed on the merits? Will the applicant be irreparably injured absent a stay? Will a stay injure the other parties? Does the public interest favor a stay?" *Brown v. Yost*, 133 F.4th 725, 731 (6th Cir. 2025) (citation modified). The defendants bear the burden of showing they are entitled to a stay. *Id.* And given that we ultimately review a preliminary-injunction order for an abuse of discretion, *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 454 (6th Cir. 2014), in deciding whether to grant a stay "we must determine whether the defendants are likely to be able to show that the district court abused its discretion

when it issued the preliminary injunction." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 380 (6th Cir. 2008).

II.

In my view, the state defendants are not likely to show that the district court in any way abused its discretion. So a stay of the district court's order is not warranted. I will first address the jurisdictional issues discussed by the majority.

*Standing.* The district court properly found the plaintiff organizations had associational standing to sue on behalf of its members. The three requirements of standing are "injury in fact, causation, and redressability." *Nader v. Blackwell*, 545 F.3d 459, 471 (6th Cir. 2008) (citation modified). And an association may sue on behalf of members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Dayton Area Chamber of Commerce v. Kennedy*, 147 F.4th 626, 632 (6th Cir. 2025) (citation modified). "[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Id.* (quoting *Int'l Union, UAW v. Brock*, 477 U.S. 274, 290 (1986)).

The plaintiffs identified two members who suffered an injury attributable to Ohio's law. *See Tenn. Conf. of NAACP v. Lee*, 139 F.4th 557, 562 (6th Cir. 2025) ("*NAACP II*"). Those individuals wanted to be afforded the opportunity to register to vote, without providing documentary proof of citizenship, when they applied for a driver's license at a BMV location. But they were not afforded that opportunity, because of the Ohio law at issue. That is enough. In my view, it does not matter that these individuals were unsuccessful in their initial attempts to obtain Ohio driver's licenses because they lacked the proper identity-confirmation documentation. Their argument is that they should have been offered the opportunity to register to vote upon submission of their driver's-license applications, even if those applications were ultimately unsuccessful. But

Ohio law prohibited the BMV's deputy registrars from offering them that opportunity unless the individuals first produced documentary proof of citizenship.

And just because the named individuals were eventually able to register to vote does not mean they were not harmed by Ohio's prohibition against offering a voter registration form to driver's license applicants who fail to submit documentary proof of citizenship. Other courts have persuasively found standing as to plaintiffs subject to documentation requirements for voting. *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1120 (10th Cir. 2020); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009); *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008). I would take the same approach as those courts and the district court here.

*Mootness*. The fact that the two individuals identified by plaintiffs ultimately registered to vote does not render this case moot, because this case falls under the exception to the mootness doctrine for injuries that are capable of repetition yet evade review. This exception applies when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005) (citation modified). Cases involving elections "are one of the quintessential categories of cases" where this exception applies "because litigation has only a few months before the remedy sought is rendered impossible by the occurrence of the relevant" election-related deadline. *Id.* Indeed, the second prong of this test is "somewhat relaxed in election cases." *Id.* at 372. To illustrate, we have held that an injury incurred due to an election-related state law satisfies the second prong if it "almost invariably will recur with respect to some future . . . voter in Ohio." *Id.*; *see also Honig v. Doe*, 484 U.S. 305, 335-36 (1988) (Scalia, J., dissenting) ("[S]ome of our election law decisions . . . differ from the body of our mootness jurisprudence . . . in dispensing with the same-party requirement entirely, focusing instead upon the great likelihood that the issue will recur *between the defendant and the other members of the public at large* . . . ."); *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 424 (5th Cir. 2014) ("[I]n election law cases such as this one, where (1) the state plans on continuing to enforce the challenged provision, and (2) that provision will

affect other members of the public, the [capable-of-repetition-yet-evading-review] exception is met.").

Here, it is reasonable to expect that other members of plaintiff organizations—in other words, "future . . . voter[s] in Ohio," *Lawrence*, 430 F.3d at 372—could be harmed by Ohio's prohibition against offering a voter registration form to driver's license applicants who do not submit documentary proof of citizenship. A contrary ruling as to mootness would mean that potential voters who challenge an unlawful state law governing voter registration would have to forgo their registration and right to vote for as long as it took to litigate their challenge to the law. I am reluctant to construct a Catch-22 that would require a litigant to renounce a "fundamental" right in order to bring suit. *League of Women Voters v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008).

III.

Because I do not see the jurisdictional issues in the same way the majority sees them, I would reach the other stay-related questions. And on that front, it is not necessary to repeat the district court's thorough analysis. *See Red Wine & Blue*, 2026 WL 2480676, at *21-25; RE 63, Order Denying Stay, PageID 1894-99. But I will make a few brief points to emphasize why, as a whole, the stay factors do not favor the state.

*Likelihood of success on the merits*. First, the state defendants cannot show that they are likely to win on the merits. The National Voter Registration Act requires voter registration to be offered to individuals who "submit" a "driver's license application." 52 U.S.C. § 20504(a). In Ohio, an applicant "submits" an application by presenting the application form to a deputy registrar at the BMV, even if that application is defective in some way. (I disagree with the state and the majority as to this point.) And when an applicant submits her driver's license application, Ohio should offer that applicant the opportunity to register to vote pursuant to the NVRA, even if the application will ultimately be unsuccessful due to the failure to produce documents necessary to obtain a license. *See also Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997) (upholding constitutionality of NVRA).

But Ohio's new state law requires driver's license applicants to show documentary proof of citizenship *before* Ohio will offer them a voter registration form. Ohio Rev. Code § 3503.11(A)(1) (as amended June 30, 2025). That requirement conflicts with the NVRA's requirement that a driver's license application "submitted" to an appropriate state official should "serve as an application for voter registration." 52 U.S.C. § 20504(a)(1). The requirement also goes beyond the NVRA's prohibition on requiring more than the "minimum amount of information necessary" for voter registration. *Id.* § 20504(c)(2)(B)(ii). One way we know that Ohio's new requirement goes beyond the "minimum amount of information necessary" is that Ohio does not ask for or require documentary proof of citizenship when potential voters use any other available registration mechanism, such as mail or online registration. *See, e.g.*, Ohio Rev. Code §§ 3503.14, 3503.20. Because Ohio's new requirement for driver's license applicants is inconsistent with and contrary to what the NVRA prescribes, and as the district court correctly concluded, the plaintiffs are likely to succeed on their argument that the NVRA preempts Ohio's law. *Red Wine & Blue*, 2026 WL 2480676, at *14, 21-22.

*Irreparable harm.* The state cannot show irreparable harm. Ohio already allows potential voters, without presenting documentary proof of citizenship, to fill out a paper form at the BMV and give it to a BMV employee, who then transmits the form to election officials for processing. RE 35-1, Decl. of Sydney King, PageID 1136-37; RE 35, Opp'n to Prelim. Inj., PageID 1123. The district court's injunction merely prevents the state from requiring documentary proof of citizenship at the BMV before offering a voter registration form to a person applying for a driver's license. And the injunction specifically excludes from its reach those driver's license applicants who present information showing that they are noncitizens. *Red Wine & Blue*, 2026 WL 2480676, at *24.

That is all that the district court has asked of the state, and the district court has "provid[ed] the state [a] wide berth to design and implement the specific procedures for complying with the district court's order." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 241 (6th Cir. 2011). The court's injunction, in fact, tracks Ohio's requirements for voter registration via other

means, so it cannot irreparably harm the state. The state advances several arguments predicated on what it believes the district court's narrow injunction demands. For example, the state laments the potential for voter confusion, the need to engage in "wholesale retraining and restructuring of the BMV application process," and the possibility that "hastily-trained clerks may inadvertently encourage non-citizens to vote illegally." CA6 R. 5, Mot., at 23-24. But nothing in the record or the limited sweep of the district court's injunction suggests that any of these concerns are valid. There is no proof, for instance, that voters will be confused by a deputy registrar offering them a paper form that is already available elsewhere at the BMV.

*Whether a stay would harm the opposing parties, and the public interest.* As the state defendants cannot show either a likelihood of success or irreparable harm, they are not entitled to a stay. *SawariMedia, LLC v. Whitmer*, 963 F.3d 595, 596 (6th Cir. 2020) (order). But it bears noting that the remaining equitable stay factors also favor the plaintiffs, not the state.

There is a strong interest in ensuring that citizens can register to vote—a process that the NVRA is meant to facilitate, not hamper. And nothing about the district court's injunction threatens the integrity of elections or Ohio's ability to preclude voting by those who are not entitled to vote. *Cf. Summit Cnty Democratic Cent. & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004). Again, the injunction requires nothing less than Ohio requires from those who register to vote via other mechanisms. And as the district court pointed out, "the final decision to add someone to the State's voter rolls is with the appropriate State election official, not the BMV or its employees offering and receiving registration forms." 2026 WL 2480676, at *25. In complying with the injunction Ohio can and will still route registration forms through its usual processes. If those processes are insufficient to ensure that only eligible voters register to vote, that would be a problem attributable to the state of Ohio, not the district court's injunction.

One final note as to the equities. The state asks us to consider the Supreme Court's guidance "that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Tenn. Conf. of NAACP v. Lee*, 105 F.4th 888, 895 (6th Cir. 2024) ("*NAACP I*") (per curiam) (citation modified); *see also Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). When

we consider a stay motion involving a rule or procedure related to an upcoming election, we apply this principle "within the balance of the equities addressing the non-merits factors governing a stay." *NAACP I*, 105 F.4th at 896 (citation modified).

It is not clear to me that the concerns identified by *Purcell* are present here. This case does not, for example, involve an "election rule" within the meaning of that case, such as those concerning ballot initiatives or congressional maps. Nor does it involve election officials' *processing* of registration forms submitted by potential voters. *Cf. id.* at 897. Rather, the injunction issued in this case concerns third-party *dissemination* of registration forms. It simply requires BMV workers to offer voter registration forms to those who apply for a driver's license—unless, of course, BMV workers learn that a driver's license applicant is not a citizen. These forms are already available at the BMV, so all BMV personnel have to do is provide the forms to applicants. The injunction changes nothing about who can register at a BMV, Ohio's qualifications for voting, the processing of registration forms, how Ohio runs its elections, or anything else related to the upcoming election. The concerns animating the *Purcell* inquiry, we have said, are "the risk of voter confusion and the unfairness of unexpected administrative burdens." *Id.* Here, there is no risk of confusion to potential voters and minimal burden to BMV employees, much less any change to an "election rule" within the meaning of *Purcell.*

But even if we factor *Purcell* into the equation, it would not move the needle for me. After all, *Purcell* itself demands "careful consideration" of any legal challenge that involves "the possibility that qualified voters might be turned away from the polls." *U.S. Student Ass'n*, 546 F.3d at 387 (quoting *Purcell*, 549 U.S. at 4). Here, the state (not a federal court) changed the law governing the registration mechanism at issue, in the summer of 2025. Plaintiffs acted promptly in bringing their challenge later in the summer, and then, several months later, filing a motion for preliminary injunction. And the district court likewise acted promptly in ordering briefing, holding a hearing, and issuing—two months after the hearing and six weeks before this year's October 5 registration deadline—a preliminary injunction and a comprehensive 54-page opinion explaining its reasoning. This is not a case where a plaintiff "unreasonably delayed" bringing a challenge, *cf.*

*Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (order). Nor is it a case where a district court failed to explain its reasoning or find the relevant facts, *cf. Purcell*, 549 U.S. at 3-5. At bottom, giving the state six weeks to comply with the modest requirements set out in the injunction does not represent a threat to the integrity of the state's procedures "on the eve of an election." *NAACP I*, 105 F.4th at 895 (citation modified).

IV.

For these reasons, I respectfully dissent from the majority's decision to grant a stay.

ENTERED BY ORDER OF THE COURT

Kelly L. Stephens

Kelly L. Stephens, Clerk