**No. 26-3813**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

RED WINE & BLUE, *et al.*,
*Plaintiffs-Appellees*,

v.

FRANK LAROSE, IN HIS OFFICIAL CAPACITY
AS OHIO SECRETARY OF STATE, *et al.*,
*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Northern District of Ohio
No. 1:25-cv-1760

---

# BRIEF OF *AMICUS CURIAE* THE HONEST ELECTIONS PROJECT IN SUPPORT OF DEFENDANTS-APPELLANTS

---

Jason B. Torchinsky
*Counsel of Record*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
PLLC
2300 N Street N.W.
Suite 643
Washington, D.C. 20037
(202) 737-8808 |
jtorchinsky@holtzmanvogel.com

Elizabeth Price Foley
Steven LaRussa
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
PLLC
2333 Ponce de Leon Blvd.
Suite 600
Coral Gables, FL 33134
(305) 379-1601
efoley@holtzmanvogel.com

Counsel for *Amicus Curiae* The Honest Elections Project

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 26-3813 Case Name: Red Wine & Blue et al. v. LaRose et al.

Name of counsel: Jason B. Torchinsky

Pursuant to 6th Cir. R. 26.1, The Honest Elections Project
*Name of Party*
makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on November 24, 2026 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Jason B. Torchinsky

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTEREST OF *AMICUS CURIAE* ........ 1

INTRODUCTION ........ 2

ARGUMENT ........ 6

I. NVRA Section 5 Is a Bundling Rule for Driver's-License Applications Submitted Under State Law, Not a Command that Every Failed Licensing Attempt Become a Federal Voter Registration ........ 6

A. Section 5 is triggered by a State driver's-license application submitted under State law. ........ 8

B. The district court collapsed Section 5 into Section 7 and erased Congress's different duties for different State offices. ........ 12

II. The Federalism Canon Forecloses Construing Section 5 to Preempt States' Traditional Authority Over Licensing and Voter Qualifications. ........ 15

A. Congress did not provide an unmistakably clear statement that Section 5 preempts States' authority to decide when a driver's-license application is submitted. ........ 15

B. *Inter Tribal* confirms that States retain authority to set and enforce voter qualifications. ........ 18

III. The Injunction's Administrability Problems Confirm That the District Court's Rule Is Wrong. ........ 21

A. The injunction creates front-end confusion without expanding the lawful registration channels Congress preserved......21

B. The Court should reject a remedial rule that destabilizes Ohio's integrated licensing and registration system. ......23

CONCLUSION......26

CERTIFICATE OF COMPLIANCE......27

CERTIFICATE OF SERVICE......28

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .................................................. 15–16, 18–20, 24

*Ass'n of Cmty. Orgs. for Reform Now v. Miller*,
129 F.3d 833 (6th Cir. 1997) ........................................................... 8

*Bond v. United States*, 572 U.S. 844 (2014)............................................ 15

*Cleveland v. United States*, 531 U.S. 12 (2000) ............................... 16–17

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ............................................... 15

*Hendrick v. Maryland*, 235 U.S. 610 (1915) ............................................ 16

*League of United Latin Am. Citizens v. Bredesen*,
500 F.3d 523 (6th Cir. 2007) ........................................................... 7

*Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533 (2002)...................... 15

*United States v. Turner*, 465 F.3d 667 (6th Cir. 2006) ........................... 17

**Constitutional Provisions**

Ohio Const. art. V, § 1 .......................................................................... 20

**Statutes**

52 U.S.C. § 20503 ..................................................................................... 4–6

52 U.S.C. § 20504
.................................................................... 2, 4–8, 10–17, 19, 24

52 U.S.C. § 20505 ..................................................................................... 5–6

52 U.S.C. § 20506 .......... 4–5, 7, 13–14

Ohio Rev. Code § 3503.01 .......... 20

Ohio Rev. Code § 3503.10 .......... 13

Ohio Rev. Code § 3503.11 .......... 4, 14, 20, 22, 25

Ohio Rev. Code § 3503.19 .......... 22, 25

Ohio Rev. Code § 3503.20 .......... 22, 25

Ohio Rev. Code § 4507.21 .......... 11

Ohio Rev. Code § 4507.22 .......... 11

**Regulations**

Ohio Admin. Code 4501:1-1-21 .......... 3, 8, 11

2009 Ohio Admin. Code 4501:1-1-21 .......... 9, 18

**Rules**

Fed. R. App. P. 29(a)(3) .......... 2

## INTEREST OF *AMICUS CURIAE*

The Honest Elections Project ("HEP") supports election integrity and the rule of law. HEP has previously participated as *amicus curiae* before the district court and this Court in support of Defendants-Appellants. *See* Amicus Br., R. 38-1, Page ID # 1435; Amicus Br., Doc. 17. It has an interest in ensuring that federal courts respect the Constitution's limits on federal jurisdiction and States' power to determine and enforce voter qualifications. This case implicates those limits because the district court's decision, if affirmed, will limit Ohio's authority to determine and enforce voter qualifications while complying with the National Voter Registration Act ("NVRA"). It will threaten the orderly administration of elections and impair the State's ability to draw a clear, administrable line between eligible citizens and persons not shown to be eligible to register.

The State's opening brief ably explains why Plaintiffs lack standing, why their request for preliminary relief is moot, and why Ohio's reading of NVRA Section 5 is correct. This brief addresses a narrower structural point: By requiring Ohio BMV employees to affirmatively offer voter registration when no completed driver's-license application has

been submitted under Ohio law, the injunction imports Section 7's proactive agency duties into Section 5. This reading collapses a distinction Congress deliberately drew and imposes obligations Congress did not include in the motor-voter provision. In practical terms, BMV employees would have to affirmatively offer voter registration even when an individual's attempted driver's-license application is incomplete and cannot be accepted under Ohio law. That result lets a federal voter-registration statute override a State's threshold rules for when a driver's-license application exists at all, disrupting the division of authority the NVRA preserves between federal registration procedures and state licensing systems.

HEP files this brief with an accompanying motion for leave under Federal Rule of Appellate Procedure 29(a)(3).

## INTRODUCTION

The district court's injunction rests on a category error. Section 5 of the NVRA makes a "submitted" state motor-vehicle driver's-license application serve as a federal voter-registration application unless the applicant fails to sign the voter-registration application. 52 U.S.C. § 20504(a)(1). It does not transform every incomplete, unsuccessful, or

abandoned attempt at submitting a driver's-license application into a federal registration transaction. Nor does it require BMV personnel to solicit voter registration outside the State's licensing process that Congress chose as Section 5's trigger.

Ohio's system tracks that trigger. First-time driver's-license applicants must present documents establishing identity, date of birth, Social Security number, Ohio residence, and legal presence. King Decl., R. 35-1, Page ID # 1134–1135, ¶¶ 8, 12–14, 18. When those prerequisites are satisfied and the applicant is marked as a citizen, the BMV system advances to the voter-registration prompts. *Id.* at Page ID # 1135–36, ¶¶ 14, 16, 18, 21. When required documents are missing, the applicant "cannot complete an application for a credential," and incomplete applications "are not saved in the BASS system." *Id.* at Page ID # 1135, ¶¶ 15, 18; *see id.* at Page ID # 1137, ¶ 32; Ohio Admin. Code 4501:1-1-21(D), (N). King's later stay declaration makes the point still more explicit: If required documents are missing, the deputy registrar does not begin a BASS transaction, no failed-application record exists in BASS, and BMV does not keep or store applicant information; if a transaction begins but is abandoned, BASS still saves no applicant information. King

Decl., R. 59-1, Page ID # 1862, ¶¶ 7–9. Paper voter-registration forms remain available through the BMV's walk-in process, and completed forms must be transmitted to election officials. King Decl., R. 35-1, Page ID # 1136–37, ¶¶ 25–27; Ohio Rev. Code § 3503.11(C)(1)–(2).

The district court treated that sequencing as an NVRA violation and required Ohio to offer voter registration to driver's-license applicants who are "ultimately unsuccessful in obtaining a driver's license for lack of sufficient documents under Ohio's licensing requirements[,]" unless their materials show non-citizenship. PI Op., R. 57, Page ID # 1842. That remedy rewrites Section 5 by treating a *failed* attempt to submit a driver's license as a "submitted" driver's-license application. It also converts Ohio's paper-form availability obligation into a proactive-offer duty outside the completed electronic licensing transaction, even though that kind of proactive duty appears in Section 7, not Section 5. *See* 52 U.S.C. §§ 20504(a), 20506(a)(4).

The NVRA's structure confirms the error. Section 4 identifies three registration channels: (1) simultaneous registration with a motor-vehicle application; (2) mail registration; and (3) in-person registration at designated offices. *Id.* § 20503(a). Section 5—the so-called "motor voter"

provision—governs the first channel by attaching voter registration to a "submitted" driver's-license application. *Id.* § 20504(a)(1). Section 7 governs the third channel via designated voter-registration agencies and imposes the proactive distribution, assistance, declination, acceptance, and transmittal duties Congress chose for that channel. *Id.* § 20506(a)(4), (6).

The district court's injunction collapses the distinction between Sections 5 and 7. That distinction gives administrators a clear path by which to proceed: If a license application is submitted under state law, Section 5 applies; if state law does not permit the application to be accepted because required licensing documents are missing, Section 5 has not yet been triggered. This statutory structure reserves electronic motor-voter registration for "submitted" driver's-license applications, while leaving available mail registration under Section 6 and traditional in-person voter registration at designated agencies under Section 7. *Id.* §§ 20503(a), 20505, 20506.

That reading also creates a federalism problem. Driver licensing is a traditional state responsibility, and States set and enforce voter qualifications. Congress did not clearly state that Section 5 overrides

Ohio's rules for when a driver's-license application is submitted. Under the federalism canon, that is another reason to reject the district court's construction of Section 5.

The Court should therefore reverse the preliminary injunction and reject the theory that an incomplete or unsuccessful driver's-license transaction must be treated as a "submitted" motor-voter application under NVRA Section 5.

## ARGUMENT

### I. NVRA Section 5 Is a Bundling Rule for Driver's-License Applications Submitted Under State Law, Not a Command that Every Failed Licensing Attempt Become a Federal Voter Registration.

The NVRA does not treat every State government office as an identical voter-registration office. Section 4 requires States to provide registration through three distinct channels: (1) simultaneously with a motor-vehicle driver's-license application; (2) by mail; and (3) in person at designated offices. 52 U.S.C. § 20503(a). Sections 5, 6, and 7 then assign different duties to different channels. Section 5 governs the motor-vehicle channel by tying voter registration to a "submitted" driver's-license application. *Id.* § 20504(a). Section 6 governs mail registration. *Id.* § 20505. Section 7 governs in-person registration at designated

agencies and supplies the proactive offer-and-assistance model. *Id.* § 20506. That statutory text and structure are the starting point, and they are the point the district court missed.

Section 5's operative sentence provides that "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration" unless the applicant fails to sign the voter-registration application. *Id.* § 20504(a)(1). The plain text of Section 5 selects a concrete trigger: a driver's-license application "submitted . . . under State law." *Id.* Congress did not say that every BMV visit, every incomplete form, every unsuccessful attempt to obtain a driver's license, or every licensing file the State refuses to accept must serve as an application for voter registration. Instead, only those driver's-license applications "submitted . . . under State law" must serve that purpose.

That language matters because driver licensing is an area of traditional state authority. *See League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 532 (6th Cir. 2007). States decide who may receive a license, what identification must be presented, what proof of

legal presence is required, what fee must be paid, and when the application is complete enough to be accepted and processed. Congress may impose federal registration duties through the NVRA, and this Court has upheld the Act as a valid Elections Clause statute. *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 837–38 (6th Cir. 1997). But Section 5 does not silently federalize the threshold conditions for submitting a driver's-license application. Its text points the other way by expressly making submission turn on "State law." 52 U.S.C. § 20504(a)(1).

### A. Section 5 is triggered by a State driver's-license application submitted under State law.

Ohio law requires driver's-license applicants to provide identity documents before a license application may be accepted and processed. Ohio Admin. Code 4501:1-1-21(A), (C). The record shows that Ohio's BMV requires documents proving full legal name, date of birth, Social Security number, Ohio residence, and legal presence in the United States. PI Opp'n, Exs. A-1–A-3, R. 35-1, Page ID # 1139–215. Ohio adopted the legal-presence requirement in 2009, and the 2009 rule provided that failure to present required acceptable identification documents "shall result in the denial of the application" and that, without the required

identification, "the application shall not be accepted by the registrar of motor vehicles or any deputy registrar." 2009 Ohio Admin. Code 4501:1-1-21(B), (M), R. 29-20, Page ID # 1070, 1076.

The record also shows why the BMV's electronic workflow mirrors those state-law prerequisites. Ohio's BMV uses the BASS system to process applications. King Decl., R. 35-1, Page ID # 1133, ¶ 3; King Decl., R. 59-1, Page ID # 1861–62, ¶¶ 3, 6. When all required documents are provided, the deputy registrar enters the information, an interim credential issues, and the system advances to voter-registration prompts. King Decl., R. 35-1, Page ID # 1135–36, ¶¶ 12–14, 16, 18, 21. When the applicant lacks the required documents, the applicant "cannot complete an application for a credential," and incomplete applications "are not saved in the BASS system." *Id.* at Page ID # 1135, ¶ 15; *see id.* at Page ID # 1137, ¶ 32. King's later declaration confirms the operational point: When required documents are missing, no BASS transaction begins and no failed-application record exists; even an abandoned transaction leaves no saved applicant information. King Decl., R. 59-1, Page ID # 1862, ¶¶ 7–9.

Those facts are not side issues. They identify the moment at which the federal motor-voter duty attaches under Section 5—only *after* a driver's-license application has crossed the State's threshold for submission and processing. The district court's contrary rule treats Section 5's reference to a "driver's license application submitted to the appropriate State motor vehicle authority under State law" as if it means any document—no matter how incomplete or inadequate under State law—that a person hands to a BMV employee. But Section 5 does not ask whether an individual has physically handed over a form. It asks whether a State's driver's-license application has been submitted to the State's motor-vehicle authority under State law. 52 U.S.C. § 20504(a)(1). That state-law condition matters because the object that "shall serve" as a voter-registration application is the State licensing application Congress chose to incorporate, not an incomplete interaction that the State cannot accept, process, save, or transmit. State driver's-license applications are not free-floating pieces of paper.

The stay panel recognized that "not all driver's license holders may vote" because "[s]ome drivers, for instance, are too young." Stay Op., Doc. 23, at 3. That observation is useful because it illustrates that an

application accepted for adjudication but denied on an eligibility ground is not the same as an attempted transaction that Ohio never accepts as a submitted application at all. Here, Plaintiffs' record evidence addresses only the latter category—i.e., eligible adults who lacked required documents during initial BMV visits. PI Op., R. 57, Page ID # 1818–21.

The distinction between the submitted-but-rejected versus incomplete-and-never-submitted categories is important under Ohio law. A twelve-year-old who supplies the documents Ohio requires and then presents a completed, signed application on the approved form—but is then rejected because he is too young—has submitted an application that may trigger Section 5 before failing on voter-eligibility grounds. *See* Ohio Rev. Code §§ 4507.21(E), 4507.22; Ohio Admin. Code 4501:1-1-21(D), (N). By contrast, when required licensing documents are missing, the application is never completed or accepted, no BASS transaction or saved failed-application record exists, and no voter-registration portion is ever reached. King Decl., R. 59-1, Page ID # 1862, ¶¶ 7–9; King Decl., R. 35-1, Page ID # 1135, 1137, ¶¶ 15, 32; *see also* 52 U.S.C. § 20504(e)(1).

Other parts of Section 5 confirm that Congress was addressing a completed, accepted, and administrable submission. Section 5(e) sets

transmittal deadlines for a "*completed* voter registration portion of an application for a State motor vehicle driver's license accepted at a State motor vehicle authority." *Id.* § 20504(e)(1) (emphasis added). That language fits a record capable of being transmitted to election officials. It does not fit an abandoned or incomplete intake attempt for which the BMV system saves no application and never reaches the voter-registration prompt. King's later declaration reinforces the point because the BMV does not deem an original or renewal driver's-license application "submitted" unless and until all required components are present and approved by the deputy registrar. King Decl., R. 59-1, Page ID # 1865, ¶¶ 26–28.

### B. The district court collapsed Section 5 into Section 7 and erased Congress's different duties for different State offices.

The district court's reading becomes weaker when Section 5 is read beside Section 7. Congress knew how to impose proactive offer-and-assistance duties when it wanted to do so. Section 7 requires States to designate voter-registration agencies, distribute mail registration forms, assist applicants unless assistance is refused, accept completed forms for

transmittal, and, for certain offices, ask a prescribed registration question with declination language. 52 U.S.C. § 20506(a)(1)–(4), (6).

Section 5 contains no comparable script. It does not require BMV clerks to ask every customer whether he would like to register, assist every failed licensing applicant, treat silence as a declination, or provide the "same degree of assistance" that the office provides for its own benefits forms. *Compare id.* § 20506(a)(6)(C), *with id.* § 20504. Section 5 instead integrates voter registration into a driver's-license application "submitted . . . under State law," and the ability to register to vote under Section 5 thus depends on whether the application is considered to be submitted under State law.

Ohio law preserves the same distinction between voter registration under Section 5 versus Section 7. For voter registration via Section 7 (designated agencies), Ohio law requires State officials to affirmatively provide forms, assistance, acceptance, confidentiality, and transmission. *See* Ohio Rev. Code § 3503.10. For voter registration via Section 5 (BMV offices), by contrast, Ohio law provides an integrated electronic motor-voter registration process when a driver's-license application is submitted in accordance with State law, while separately requiring paper

voter-registration applications and update forms to be available to other customers and requiring completed paper forms to be transmitted. *See id.* § 3503.11(A), (C).

The district court's injunction inappropriately transformed that availability obligation into a proactive-solicitation obligation for unsuccessful driver's-license applicants. *See id.* § 3503.11(C)(1)–(2); Stay Op., Doc. 23, at 12. That is not Section 5 interpretation; it is Section 7 importation. The statutory contrast between Sections 5 and 7 is decisive: If Congress had wanted every motor-vehicle office under Section 5 to perform the same proactive registration-agency functions as public-assistance and disability-service offices under Section 7, it could have said so. But it did not. It expressly imposed proactive distribution, assistance, acceptance, and declination duties in Section 7, but did not impose those duties in Section 5. *Compare* 52 U.S.C. § 20506(a)(4), (6), *with* 52 U.S.C. § 20504(a), (c), (e).

Nor is the distinction a technicality. Section 7 supplies a standalone registration opportunity accompanying a service interaction at designated agencies. Section 5 uses a submitted driver's-license application as the vehicle for registration. The point of Section 5 is

simultaneity: the driver's-license application "submitted . . . under State law" is the one that "shall serve" as a voter-registration application. 52 U.S.C. § 20504(a)(1). Without a driver's-license application deemed submitted under State law, there is no obligation to provide voter registration under Section 5.

## II. The Federalism Canon Forecloses Construing Section 5 to Preempt States' Traditional Authority Over Licensing and Voter Qualifications.

### A. Congress did not provide an unmistakably clear statement that Section 5 preempts States' authority to decide when a driver's-license application is submitted.

The federalism canon—sometimes referred to as the clear-statement principle—protects the federal-state balance by requiring Congress' statutory language to be "unmistakably clear" before courts read a federal statute to intrude on traditional state authority. *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991); *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 543–44 (2002). The federalism canon is a "well-established . . . background principle" of statutory construction that is routinely applied to federal laws regulating areas of traditional state authority. *Bond v. United States*, 572 U.S. 844, 858 (2014) (citing cases). In the Elections Clause context, *Arizona v. Inter Tribal Council of*

*Arizona, Inc.*, teaches that Congress has broad authority over the "how" of federal elections, but not the "who"; voter qualifications remain the province of the States. 570 U.S. 1, 16 (2013).

State licensure laws, including driver's licensure, are a quintessential exercise of States' traditional police powers. *See Cleveland v. United States*, 531 U.S. 12, 23 (2000); *Hendrick v. Maryland*, 235 U.S. 610, 622 (1915). Like all States, Ohio has sovereign authority to decide what information an applicant must provide to obtain a license, and when that information has been satisfactorily provided for the application to be accepted and processed. Nothing in Section 5 unmistakably preempts that State licensure authority; to the contrary, Section 5 contains no clear statement requiring States to treat incomplete licensing attempts as submitted driver's-license applications. The text points the other way: It uses the State's own driver's-license application, "submitted . . . under State law" as the trigger for the federal motor-voter registration. 52 U.S.C. § 20504(a)(1). Section 5 thus clearly articulates a State-law trigger before a driver's-license application "shall serve as an application for voter registration" for federal elections. *Id.* The statute's plain text makes

clear that Congress did *not* desire to federalize threshold conditions for submitting a State driver's-license application.

The Supreme Court in *Cleveland* took this approach, refusing to construe the federal wire fraud statute to cover fraudulent statements in connection with an application for a state license. *Cleveland*, 531 U.S. at 24; *accord United States v. Turner*, 465 F.3d 667, 683 (6th Cir. 2006). The Court acknowledged that state licensure laws are "paradigmatic exercises of the States' traditional police powers[,]" and if Congress wanted to criminalize fraud in connection with State licensure, it must provide a "clear statement" of its intent to do so. *Cleveland*, 531 U.S. at 23–24.

The district court's contrary reading of Section 5 would turn a federal statute that aligns voter registration with State licensing systems into one that rewrites those State licensing systems. That is too much federal displacement to infer from silence. If Congress intended Section 5 to require States to treat incomplete or unaccepted licensing attempts as submitted driver's-license applications, it needed to say so clearly. It did not. Section 5's express reference to applications submitted "under State law" points in the opposite direction. 52 U.S.C. § 20504(a)(1).

### B. *Inter Tribal* confirms that States retain authority to set and enforce voter qualifications.

*Inter Tribal* makes the same point in the NVRA context. The Supreme Court held that the Elections Clause lets Congress regulate how federal elections are held, but "not *who* may vote in them." *Inter Tribal*, 570 U.S. at 16 (emphasis in original). That authority remains the province of the States. *Id.* The Court therefore warned that "serious constitutional doubts" would arise if a "federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." *Id.* at 17. And although the NVRA limits what a State may demand on the Federal Form, the Court emphasized that the Act does not prevent States from denying registration based on information already in their possession establishing an applicant's ineligibility. *Id.* at 15.

Those principles fit this case because the injunction does not merely regulate the mechanics of voter registration; it commands Ohio to treat an attempted licensing transaction as a "submitted" driver's-license application, even when the applicant has not provided the documents that Ohio law requires for the application to be accepted. *See* 2009 Ohio Admin. Code 4501:1-1-21(M), R. 29-20, Page ID # 1075; King Decl., R. 35-

1, Page ID # 1135, ¶¶ 15, 18; King Decl., R. 59-1, Page ID # 1862, ¶¶ 7–9; Tr., R. 55, Page ID # 1649. Section 5 attaches only to a driver's-license application "submitted . . . under State law," 52 U.S.C. § 20504(a)(1), and Ohio's record evidence shows that when required licensing documents are missing, the applicant cannot complete a credential application, BASS does not save the incomplete application, and the system never reaches the voter-registration step. King Decl., R. 35-1, Page ID # 1135, ¶¶ 15, 18; *id.* at Page ID # 1137, ¶ 32; King Decl., R. 59-1, Page ID # 1862, ¶¶ 7–9; Tr., R. 55, Page ID # 1649.

*Inter Tribal* held that Congress may regulate *how* federal elections are held but not *who* may vote in them, and it avoided reading the NVRA to prevent States from using information necessary to enforce voter qualifications. *Inter Tribal*, 570 U.S. at 15–17. Ohio's law respects that division. When a driver's-license application is submitted under Ohio law and the applicant is eligible for electronic motor-voter registration, Section 5 makes that application serve as a voter-registration application. 52 U.S.C. § 20504(a)(1). But when the attempted licensing transaction *never becomes* a submitted driver's-license application under Ohio law, the applicant is not cut off from voter registration; the

individual may submit a paper voter-registration form, made available at BMV offices, and Ohio law requires that completed paper form to be transmitted to election officials. Ohio Rev. Code § 3503.11(C)(1)–(2).

The driver's licensing documents are not themselves voter qualifications. But they generate citizenship status information that bears directly on Ohio's enforcement of its voter qualification that only United States citizens may vote. *See* Ohio Const. art. V, § 1; Ohio Rev. Code § 3503.01(A). Reading Section 5, as the district court did, to require motor-voter registration when Ohio's law does not recognize a driver's-license application as properly "submitted" creates the very constitutional tension that *Inter Tribal* recognized must be avoided.

The district court tried to avoid this problem by exempting applicants whose materials show they are noncitizens. PI Op., R. 57, Page ID # 1842. But that carveout proves Ohio's point. If the BMV may rely on information in the licensing transaction to avoid offering registration to a known noncitizen, then the BMV may also rely on the absence of a driver's-license application submitted under State law to conclude that Section 5 has not yet been triggered. The same record-based, state-law sequencing principle governs both questions.

## III. The Injunction's Administrability Problems Confirm That the District Court's Rule Is Wrong.

Election-administration rules should be clear enough for frontline officials to apply consistently. That principle matters here because the injunction requires BMV employees to create a voter-registration process based on an incomplete or insufficient driver's-license application that *Ohio law does not accept* as "submitted" and the BMV system does not preserve. The problem is not that every such interaction threatens fraud. The problem is that the injunction replaces Section 5's clear statutory trigger—submission under State law—with another one not recognized under State law.

### A. The injunction creates front-end confusion without expanding the lawful registration channels Congress preserved.

The injunction requires BMV employees to tell customers that their paperwork is insufficient to submit a driver's-license application but nevertheless sufficient to trigger a voter-registration process through that failed application. That mixed message is confusing for voters and BMV employees alike. It is also unnecessary to preserve lawful registration opportunities because Ohio already makes registration available through online registration, mail registration, in-person

registration at designated locations, and paper forms available at every BMV office. Ohio Rev. Code §§ 3503.11(C), 3503.19, 3503.20.

The stay panel correctly identified concrete implementation burdens flowing from the injunction. For example, Ohio would have to train BMV workers to process applications required by the injunction and affirmatively direct failed license applicants to paper-registration forms. Stay Op., Doc. 23, at 12. A full electronic-system overhaul could take a year and cost up to $1 million. *Id.*; King Decl., R. 59-1, Page ID # 1863–64, ¶¶ 15, 18–19. Those burdens flow from the injunction's statutory error: it asks motor-vehicle offices to administer a registration-agency function that Congress assigned elsewhere.

Those burdens are especially hard to justify because the named members ultimately obtained Ohio driver's licenses; Dutcher registered to vote, and Fazio updated her voter registration to the best of her recollection. Dutcher Decl., R. 49-1, Page ID # 1538, ¶ 18; Fazio Decl., R. 49-2, Page ID # 1541, ¶ 10. As the stay panel observed, the Association-Plaintiffs have identified no eligible would-be voter who has been prevented by Ohio law from registering to vote. Stay Op., Doc. 23, at 4–5. A statewide injunction should not rest on a theory that disregards both

the Plaintiffs before the court and the ample registration channels Ohio continues to provide.

This is the appropriate way to account for election integrity in this case. The point is not to suggest that every incomplete licensing attempt would produce an unlawful registration. The point is that Congress chose a clear, administrable trigger for Section 5, while Ohio's other registration channels remain open and election officials retain responsibility for determining registration eligibility. That balanced rule avoids unnecessary confusion without denying eligible citizens a lawful registration opportunity.

### B. The Court should reject a remedial rule that destabilizes Ohio's integrated licensing and registration system.

The district court's rule would make Section 5's motor-voter registration duty turn on whether a person merely *begins* a driver's-license interaction, not whether the State has received a license application capable of being processed under State law. That approach destabilizes both sides of the transaction. It pressures BMV clerks to treat licensing attempts that State law deems insufficient as voter-registration events, while leaving election officials to evaluate

information the licensing system was not designed to preserve. The BMV would need a new, siloed storage system for unverified voter-registration information collected during failed license applications, along with new duplicate-record protocols. King Decl., R. 59-1, Page ID # 1863–64, ¶¶ 12–17.

The better rule is simpler and faithful to the statute. When a driver's-license application is "submitted . . . under State law," Section 5 requires the voter-registration portion to be included and limits what that voter-registration portion may require. 52 U.S.C. § 20504(a), (c). When State law does not allow the driver's-license application to be accepted or processed because required licensing documents are missing, Section 5 has not been triggered. And when BMV records or application materials show ineligibility, the NVRA does not require Ohio to ignore that information. *Inter Tribal*, 570 U.S. at 15.

That construction of Section 5 preserves voter access and administrability at the same time. Eligible citizens who submit driver's-license applications receive the electronic motor-voter opportunity. Other BMV customers may use paper forms available at the office, and applicants may also register online, by mail, in person at boards of

elections and designated locations, or through another person where state law permits. Ohio Rev. Code §§ 3503.11(C), 3503.19, 3503.20. A submitted driver's-license application triggers Section 5; an incomplete transaction that State law does not accept, the BMV does not save, and the State's licensing system does not advance to the voter-registration step does not. King Decl., R. 59-1, Page ID # 1862, ¶¶ 7–9; *see also* King Decl., R. 35-1, Page ID # 1135, ¶ 15.

As a practical matter, the district court's injunction accomplishes nothing useful. It does not make voter registration available to anyone who could not *already register*; it only changes how BMV employees must handle incomplete driver's-license transactions. That change does not expand access for eligible voters, but it would force Ohio to spend substantial time and money revising its licensing system.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's preliminary injunction and hold that any attempt to obtain a driver's license that State law deems insufficient is not an application "submitted . . . under State law" within the meaning of Section 5 of the NVRA.

November 23, 2026 Respectfully submitted,

Jason B. Torchinsky
*Counsel of Record*
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2300 N Street N.W.
Suite 643
Washington, D.C. 20037
(202) 737-8808 |
jtorchinsky@holtzmanvogel.com

Elizabeth Price Foley
Steven LaRussa
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2333 Ponce de Leon Blvd.
Suite 600
Coral Gables, FL 33134
(305) 379-1601
efoley@holtzmanvogel.com

Counsel for *Amicus Curiae* The Honest Elections Project

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 4,759 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word-compatible DOCX generation in 14-point Century Schoolbook font.

/s/ Jason B. Torchinsky
Jason B. Torchinsky

## CERTIFICATE OF SERVICE

I certify that on November 23, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. All counsel of record are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Jason B. Torchinsky
Jason B. Torchinsky